IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SYLVIA LILLQUIST, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, Acting Commissioner ) <br> of Social Security, ) <br> ) <br> Defendant. ) <br> ) | 12 C 10206 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Sylvia Lillquist seeks review of the Social Security Administration's decision denying her disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381A. An Administrative Law Judge ("ALJ") determined that Lillquist is not disabled and thus not entitled to disability insurance benefits or supplemental security income. The Social Security Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner of Social Security. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Lillquist now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). For the reasons stated below, the Court vacates the ALJ's decision and remands the case for further proceedings not inconsistent with this opinion.

## BACKGROUND

Lillquist applied for disability insurance benefits and supplemental security income in 2009. In both claims, she alleged that her disability began on February 13, 2009. (R. 151). The Social Security Administration initially denied those claims on September 3, 2009 and Lillquist proceeded to a hearing before an ALJ on January 26, 2011. (R. 27). Represented by counsel,

Lillquist appeared at the hearing and testified. (*Id.*). Cheryl R. Hoiseth testified as an impartial vocation expert at the hearing. (R. 8). On June 2, 2011 the ALJ issued a decision finding that Lillquist was not disabled because she could perform light work that was limited to three to four step simple unskilled work with repetitive routine tasks, so long as she had no contact with the public and only occasional contact with coworkers and supervisors. (R. 14). The ALJ also noted that Lillquist should avoid concentrated exposure to work hazards, including unprotected heights, moving machinery, and temperature extremes. (*Id.*). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review on October 26, 2013. (R. 1). Lillquist now seeks judicial review of the ALJ's decision.

### A. Medical Evidence

Lillquist was born on July 11, 1974. She was thirty-seven on the date of the hearing. She lives with her seventeen year old daughter. (R. 32). Her mother and nephew also live in the house, which her mother owns. (*Id.*). Lillquist suffers from fibromyalgia, obesity, disc bulging at L5, early degenerative changes at C5-C6, and depression/anxiety disorder. (R. 10).

Treatment for Lillquist's depression began in 2008 at a facility called Aunt Martha's. (R. 334). The various treating physicians' notes dated from April 2009 describe symptoms of disturbed sleep, isolative behavior, anhedonia, and feelings of hopelessness. (R. 337). Doctors at Aunt Martha's also noted her obesity as well as stress surrounding her pending divorce. (R. 338).

On July 10, 2009, the Illinois Department of Disability Services referred Lillquist to Dr. Hilger, a psychologist, for a competency evaluation. (R. 365-70). Lillquist reported to Dr. Hilger that she was able to do housework, cook, drive, shop and care for herself. (R. 367). Dr. Hilger diagnosed Lillquist with dysthymic disorder and anxiety disorder with a low average intelligence. (R. 369). Dr. Hilger found that Lillquist's general assessment functioning score was

65-70 "if not higher." (*Id.*). Dr. Hilger concluded that Lillquist could perform a variety of semi-skilled types of work similar to the types of work she had done in the past. (R. 370). Though Lillquist has held a variety of positions, Dr. Hilger did not note which of Lillquist's past jobs he was referring to. Dr. Hilger reported that Lillquist put forth minimal effort during the competency evaluation. (R. 369).

Six weeks later, on August 27, 2009, the Illinois Department of Disability Services performed a psychological review and found that Lillquist's mental impairments did not meet or equal any mental listing and that Lillquist could perform simple one and two step tasks. (R. 387). Dr. Hermsmeyer performed the evaluation. (R. 371). Dr. Hermsmeyer concluded that Lillquist had mild limitations in her daily activities, that she suffered moderate limitations in her social relationships, concentration, persistence, and pace, and that there was no evidence of decompensation. (R. 381). The DDS evaluation indicated that Lillquist was partially credible. (R. 383).

Lillquist's treating physician, Dr. Shah, first examined Lillquist in September 2009. In February 2010, Dr. Shah reported diagnoses of frequent headaches, hypercholesterolemia, and depression. Dr. Shah noted at the time that Lillquist's muscle strength in her hands, wrists, fingers, forearms, and arms was normal. (R. 417). Dr. Shaw reported that Lillquist was able to perform various everyday tasks, including opening doors, picking up coins and pens, using zippers, tying shoes, and turning pages with both hands with no difficulty. (R. 420). In May 2010, Dr. Shah performed an examination of Lillquist and found that her pain was likely both joint and muscle pain. (R. 438).

Lillquist was treated at the Ecker Center for Mental Health since at least March 2009. (R. 408-12). Dr. Anwar and Dr. Kurilo treated her that year. (R. 411-13). In March 2009, Dr.

Kurilo wrote in a progress note that Lillquist had been experiencing anxiety and stress. (R. 413). A few months later in June 2009, Dr. Kurilo remarked again that Lillquist displayed signs of depression, lack of motivation, and weight gain. (R. 412). Dr. Kurilo also noted that Lillquist suffered from insomnia. (*Id.*). Dr. Kurilo described Lillquist as "pleasant" and "cooperative" in their interactions. (*Id.*). Later that year, in November 2009, Dr. Anwar saw Lillquist and reported that Lillquist was struggling with the side effects of Cymbalta. (R. 411). Dr. Anwar also reported that Lillquist was very depressed and had not been sleeping. (*Id.*).

By February 2010, Dr. Anwar reevaluated Lillquist and reported that her depression was worsening. (R. 427). Dr. Anwar reported that he examined Lillquist and found her to be alert, oriented, and cooperative, but he noted that her sleep had not been good, she felt tired, and her concentration and memory were only fair. (R. 428). He also described her insight and judgment as only fair. (*Id.*). In April, Dr. Anwar saw Lillquist for a follow-up appointment. This time, he noted that her depression had continued to worsen and that her condition was getting to the point where she could not function at all. (R. 431). She continued to see Dr. Anwar regularly and Dr. Anwar continued to report strong depression and lack of motivation. (R. 431-33). Dr. Anwar later completed a Medical Source Statement for Lillquist. (R. 434-37). He reported mild to moderate limitations in all categories except the ability to ask simple questions and request assistance, in which Dr. Anwar did not report any significant limitation.

The record contains a medical source statement dated June 2010, though it is not clear what facility or physician prepared the document. (R. 566). The document states that Lillquist could not sit, stand, walk, or lift more than five pounds. (R. 568). It also states that Lillquist must lie down for seven hours each day. (*Id.*). This medical source statement states that Lillquist is not

able to do any work for any amount of time. The statement is signed, but the signature is illegible (R. 572) and the physician did not include his or her name on the document. (R. 565).

In September 2010, Dr. Barclay of Sherman Hospital reported that Lillquist had tenderness at all eighteen fibromyalgia points. (R. 448). Dr. Barclay prescribed a functional capacity evaluation to be performed by a physical therapist. (*Id.*). Dr. Barclay concluded that she was not able to provide any assistance to Lillquist, but referred her to a neurologist. (*Id.*). Lillquist requested that Dr. Barclay write a note for her excusing her appearance at a court date for a traffic citation. Dr. Barclay refused, reasoning that Lillquist's ability to attend her medical appointments implied that she was similarly able to appear in court. (R. 449). Dr. Barclay reported that it was her opinion that Lillquist suffered from severe fibromyalgia. (R. 448).

Lillquist was treated at the Hills Healthcare Center in October and November 2010. Examinations revealed no abnormalities. (R. 456-57). Lillquist reported to staff at Hills that her pain was 4 out of 10 when she took her pain medication. (R. 455).

In December 2010, doctors at St. Alexius Medical Center performed a translaminar epidural steroid injection to treat Lillquist's lumbar degenerative disc disease. (R. 487). The treating physicians' notes report bulging at L3-L4 and L4-5, but did not document Lillquist's symptoms at the time of the procedure.

In January 2011, Therapist Heather Tod noted that Lillquist was quite seriously limited in her daily functioning and, as a result, had been unable to attend therapy. Tod also reported that Lillquist's GAF score was 41 out of 100, indicating that she was "quite seriously limited in her daily functioning." (R. 605). Tod agreed to put therapy on hold until Lillquist was well enough to attend appointments consistently. (*Id.*). Tod described Lillquist as "motivated for therapy." (*Id.*).

5

Tod also noted that Lillquist's impairments had prevented her both from attending therapy and obtaining employment. (*Id.*).

**B.   Employment History**

Lillquist received a high school diploma and completed roughly a year of college. (R. 31). Before she sought Social Security benefits, Lillquist held a variety of jobs including cashier at a casino, reservation representative at an airline, machine operator, and sales representative. (R. 208). The parties agree that Lillquist is no longer able to perform any past relevant work and has not worked since February 13, 2009. (R. 10, 19).

**C.   Disability Claim and Hearing Testimony**

Lillquist applied for disability insurance benefits and supplemental security income on March 24, 2009, alleging disability beginning on February 13, 2009. (R. 151). The Social Security Administration denied her claims on September 3, 2009 (R. 72) and her request for reconsideration on March 16, 2010. (R. 81). Lillquist requested review by an ALJ and a hearing was held on January 26, 2011. (R. 27). Lillquist, represented by counsel, appeared at the hearing and testified. (*Id.*). Cheryl Hoiseth testified as a vocational expert. (*Id.*).

**1.   Plaintiff's Testimony**

At the hearing, Lillquist testified that she suffered from fibromyalgia and depression, and that the medications she took for fibromyalgia exacerbated her depression symptoms. (R. 40). She also reported receiving steroid injections monthly at her fibromyalgia trigger points. (R. 38). She described near-constant pain in her hands. She also complained of difficulty sleeping and getting out of bed. She stated that she was able to make a sandwich and go shopping when she feels well enough, but not every day. (R. 45). On many days she needs her daughter to perform such tasks. (*Id.*). She uses her computer infrequently (R. 50) and plays games on her phone

frequently. (R. 57). At the hearing, Lillquist testified that she was experiencing a pain level of 6 out of 10. (R. 40). Lillquist additionally reported low self-esteem, difficulty concentrating, and crying spells a few times weekly. (R. 40-41). Lillquist stated that she had panic attacks once or twice a day for ten to fifteen minutes that render her unable to do anything during the attack. (R. 41). Two or three times a month Lillquist reported being too depressed to get out of bed at all. (R. 44-45). Lillquist reported travelling with her daughter to visit colleges and filing the necessary paperwork to obtain financial aid. (R. 47-48). She was able to use a zipper and to pick up coins off a table. (R. 56).

### 2. Vocational Expert Testimony

The Vocational Expert testified to Lillquist's work history. Lillquist's most recent work was over two years prior to the hearing as an assistant manager from September 2008 to April 2009. (R. 59). The VE characterized her work as light, skilled work with an specific vocational preparation ("SVP") rating of 6 out of 9.[1] (*Id.*). The VE characterized Lillquist's previous position as a casino cashier, which she held over ten years prior to the hearing from 1993 to 2001, as sedentary, semi-skilled work with an SVP of 4. (R. 59-60). The VE characterized Lillquist's position as a reservation agent with an airline, which occurred even before the casino position, as sedentary, skilled work with a SVP of 5. The VE described additional sedentary, semi-skilled work and light skilled work in Lillquist's past.

The ALJ inquired as to what jobs, if any, were available to a person with Lillquist's experience and limitations. (R. 60). Specifically, the ALJ asked the VE whether based on Lillquist's age, education, work experience, ability to lift 20 pounds occasionally, ten pounds

---

[1] SVP ratings describe the amount of time necessary to acquire the skills necessary to do a specific job at an average performance level. SVP is rated on a 1-9 scale and the higher the rating, the more time it takes to develop the skills necessary for a given job.

7

frequently, stand and/or walk a total of six hours during an eight-hour workday and sit for at least six hours. The ALJ asked the VE to limit her answer to work where that did not involve contact with the public for work purposes, but did invovle occasional contact with coworkers or supervisors. (R. 61). The VE determined that Lillquist could perform the tasks necessary to be a housekeeper, which the VE described as light, unskilled work with an SVP 2. (R. 61). The VE also found that Lillquist could be a cafeteria attendant, characterized as light, unskilled work SVP 2. (*Id.*).

Lillquist's attorney also examined the VE in the form of hypothetical questions. Under questioning by Lillquist's attorney, the VE testified that if an individual had to be off task 20% of the time during a typical workday, no jobs in the economy would be available to that individual. (R. 62). Furthermore, the VE testified that if Lillquist's testimony that she was not able to sit or stand for a full eight hour workday, even with a sit/stand option, was accurate, there would not be any jobs available to her. (R. 63). The VE further testified that if Lillquist were unable to work for two days a month all jobs would also be ruled out. (R. 65).

## **LEGAL STANDARD**

The Social Security Act provides for judicial review of administrative decisions. *See* 42 U.S.C. § 405(g). Here, the ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). The Court therefore "examines the ALJ's decision to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). The scope of judicial review is quite limited. "If the Commissioner's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the

8

first instance." *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ must build a logical bridge between relevant evidence and the ALJ's ultimate conclusion. *See Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

## DISCUSSION

In order to determine whether a claimant is disabled and thus eligible for disability insurance benefits or supplemental security income, the ALJ applies a sequential five-step inquiry. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2014). The inquiry asks: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he or she can perform the relevant work that he or she has performed in the past; and (5) whether the claimant is capable of performing any work in the national economy. *See Kastner*, 697 F.3d at 646. Here, the ALJ found that Lillquist had not engaged in substantial gainful activity since February 13, 2009. (R. 10). The ALJ further found that Lillquist had severe impairments, namely fibromyalgia, obesity, disc bulging at L5, early degenerative changes at C5-C6, and depression/anxiety disorder. (*Id.*). Despite these findings, the ALJ determined that the conditions did not meet the requirements for presumptive disability at Step Three and moved on to assess Lillquist's residual functional capacity ("RFC"). (R. 12). The ALJ determined that Lillquist could perform light work as defined in 20 C.F.R. § 404.1567(b). (R. 14). The ALJ also determined that Lillquist could not perform any past relevant work. (R. 19).

Lillquist attacks the ALJ's decision on three grounds. First, Lillquist argues that the ALJ erred in her credibility analysis. Second, Lillquist argues that the ALJ should have applied to Special Technique at Step Three and found that her conditions met the requirement for a presumptive disability. Finally, Lillquist argues that the ALJ's RFC determination was erroneous. This third argument necessarily overlaps with the first because the extent to which Lillquist's testimony is credible bears directly on the RFC determination.

### A. The ALJ's Credibility Determination

Lillquist first argues that the Court should reverse and remand because the ALJ's credibility determination was deficient. An ALJ's credibility determination is entitled to deference and will be overturned only if patently wrong. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Court's role in reviewing the ALJ's credibility determination is to ensure that the ALJ's determination is reasoned and supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "An ALJ may not reject a claimant's testimony about limitations on his daily activities solely because his testimony is unsupported by the medical evidence." *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). The Court must uphold the ALJ's credibility determination if the ALJ provides "a detailed explanation of the evidence and [the ALJ's] reasoning about credibility." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

Here, the ALJ discredited Lillquist's testimony using the same boilerplate language that the Seventh Circuit has repeatedly criticized. *See, e.g.*, *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015) (collecting cases). The ALJ wrote: "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual

functional capacity assessment." (R. 16). Without more, "[s]uch boilerplate language fails to inform [the Court] in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The fact that the ALJ found Lillquist not to be credible only to the extent that her statements were inconsistent with the ALJ's own RFC suggests that the ALJ reached the RFC first without considering Lillquists's testimony and then used that determination to assess Lillquists's credibility; the reverse is proper. *See Bjornson*, 671 F.3d at 645.

The balance of the ALJ's analysis does not render the boilerplate language harmless because it does not "otherwise explain[] [the ALJ's] conclusion adequately." *See Filius*, 694 F.3d at 868. The ALJ discussed Lillquist's medical records, but did not explain why the cited excerpts supported the conclusion that Lillquist's testimony about the "intensity, persistence and limiting effects" of the symptoms was not credible. Moreover, the ALJ's analysis does not explain why evidence consistent with the ALJ's determination was given more weight than contrary evidence. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (ALJ cannot ignore or discount evidence favorable to plaintiff's claim); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on evidence that supports her opinion."). Although the ALJ need not mention all of the evidence in the record in her opinion, the ALJ cannot ignore a line of evidence that suggests a disability. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). "[A]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, --- F.3d ---, No. 14-2498, 2015 WL 727962 at *2 (7th Cir. Feb. 20, 2015) (quoting SSR 96-7p(4)).

The ALJ did not adequately explain why or how the evidence she cited bore on Lillquist's credibility with respect to intensity, persistence, and limiting effects of her symptoms. The ALJ stated that Lillquist's "activities of daily living are inconsistent with her statements regarding limitation. She cooks, cleans, and does laundry, shops and goes to church." (R. 19). These statements, however are not inconsistent with any of Lillquist's statements regarding limitations. Lillquist testified that she sometimes goes to the store and sometimes cleans, but often needs her daughter to do these things for her. Lillquist testified to being able to sit or stand for a few hours at a time on good days, but needing to lie down for extended periods on bad days. Not only are these statements insufficient to find Lillquist not to be credible, they also do not undermine Lillquist's stated limitations. *Cf. Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) (ability to maintain a small number of close friendships did not undermine testimony that claimant was afraid to go out in public). Being able to perform occasionally the activities of daily living is a far cry from being able to perform full time work. *See Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) ("sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity") (alteration in original) (internal quotation and citation omitted).

The ALJ's statement that Lillquist had missed therapy appointments also does not bear negatively on her credibility. (R. 19). The ALJ notes that Lillquist did not immediately make an appointment to see a physical therapist when Dr. Barclay ordered physical therapy and that Lillquist exercised only minimally and gained weight before her next visit. (R. 16). The ALJ also discounted Lillquist's testimony because she sometimes missed therapy appointments. (R. 19). It is not immediately clear how Lillquist's failure to schedule or attend her appointments promptly have any impact on her credibility or the intensity, persistence, or limiting effects of her

symptoms and the ALJ did not give Lillquist the opportunity to explain the delay. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (remand appropriate where ALJ did not consider explanations for failure to keep up with treatment). In fact, the delay and lack of success at therapy seem to weigh in favor of a higher level of impairment. Indeed, Lillquist's therapist herself agreed to postpone therapy sessions because Lillquist was, in her view, not well enough to attend them. (R. 605).

The ALJ was also incorrect to discount Lillquist's credibility because Dr. Hilger reported that she had exhibited "minimal effort" during the evaluation that he performed. (R. 19). Lillquist's effort during her treatment and evaluation are relevant to her credibility, but here the ALJ impermissibly ignored relevant evidence and relied too heavily upon one evaluation. *Cf. Rodriguez v. Colvin*, No. 13 C 5683, 2015 WL 394098 at *4 (N.D. Ill. Jan 29, 2015) (efforts to comply with medical advice and participate in treatment "are highly relevant" to ALJ credibility determination). The ALJ did not, however, consider that Dr. Kurilo had previously noted that Lillquist was cooperative during her interactions with Dr. Kurilo. (R. 412). Therapist Tod, another individual who treated Lillquist, also reported that Lillquist was "motivated for therapy." (R. 605). Dr. Kurilo was a treating physician who had treated Lillquist for three years. (R. 18). Dr. Hilger was a clinical psychologist retained to perform an evaluation for the Bureau of Disability Determination Services. (R. 365). The ALJ did not provide a reason for discounting Dr. Kurilo's and Tod's statements while crediting Dr. Hilger's. This type of "cherry-picking" from the record is impermissible. *See Yurt v. Colvin*, 758 F.3d at 859.

The ALJ's flawed credibility analysis cannot be deemed harmless in this case. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce*, 739

F.3d at 1051. Here, there is not a justification for the ALJ's decision beyond that in the credibility finding and Lillquists's account of her pain "was not so contradicted by medical evidence as to be incredible." *Id*. Though it does not bear directly on the disposition of this appeal, the Court notes that the impact of the ALJ's credibility analysis is amplified here by the VE's testimony. The VE testified explicitly that no jobs would be available if any one of many aspects of Lillquist's account of her condition were credited. (R. 62). Because the credibility determination has such a direct and substantiated impact on Lillquist's entitlement to benefits, the importance of a thorough analysis of the ALJ's credibility determination was heightened. The case is therefore remanded.

    **B.**    **The ALJ's RFC Determination**

Between steps three and four, the ALJ establishes the claimant's residual functional capacity, or RFC, in order to determine what type of work the claimant is able to do given her limitations. The ALJ reached the following residual functional capacity determination:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional climbing, balancing, stooping, crouching, crawling. Claimant should have no contact with the public and only occasionally contact with coworkers and supervisors. Claimant is limited to three to four step simple unskilled work with repetitive routine tasks. Claimant should avoid concentrated exposure to work hazards to include unprotected heights and moving machinery, and avoid concentrated exposure to temperature extremes.

(R. 14). In reaching the RFC determination, the ALJ must evaluate all the evidence bearing on the severity of a claimant's symptoms, including pain, and must provide specific reasons for discounting the claimant's testimony concerning pain. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). "A treating physician's opinion is entitled to controlling weight if it's supported by

medical findings and consistent with substantial evidence in the record[.]" *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).; *see also* 20 C.F.R. § 1527(c)(2). Even if the ALJ does not give a treating physician's opinion controlling weight, "the ALJ is not permitted to simply discard it." *Scrogham*, 765 F.3d at 697. In determining the weight to afford a treating physician's opinion, the ALJ must consider: "(1) the [l]ength of the treatment relationship and the frequency of examination . . . ; (2) the [n]ature and extent of the treatment relationhip; (3) [s]uportability, i.e., whether a physician's opinion is supported by relevant evidence, such as medical signs and laboratory findings; (4) consistency with the record as a whole; and (5) whether the treating physician was a specialist in the relevant area." *Id.* (internal quotation marks omitted); 20 C.F.R. §§ 404.1527(c)(2-5). The ALJ did not properly apply these factors here.

The ALJ erred in that the RFC determination was not supported by substantial evidence because the ALJ unjustifiably discounted Dr. Anwar's opinion The ALJ paraphrased correctly that "Dr. Anwar is saying claimant cannot be around other people and cannot sustain concentration and attention." (R. 18). The ALJ discounted this assessment, however, because Lillquist testified to going to church, helping her daughter with her financial aid forms, and using the computer. (*Id.*). First, of these activities only going to church and going to the store involve any sort of social interaction and Lillquist testified that she is not able to do either consistently. Instead, she testified that her mother or daughter "often" had to shop for her because she was not able to. (R. 45). Second, Lillquist testified that she helped her daughter to fill out a financial aid application on the computer, not that she was able to use the computer frequently or for an extended period of time. (R. 49). According to Lillquist, her daughter "did most of the work" on the application. (*Id.*). These activities do constitute sustained concentration or attention and do not undermine Lillquist's account of her limitations or Dr. Anwar's assessment.

15

The occasional social interaction about which Lillquist testified is not inconsistent with Dr. Anwar's assessment and does not justify affording it less than controlling weight. In reaching the RFC determination, the ALJ noted that Dr. Anwar's treatment notes documented a history of "depression and anxiety with symptoms of crying spells, fatigue, sleep disturbance, panic attacks, anhedonia, and sadness." (R. 18). Dr. Anwar found that Lillquist had a substantial loss of her ability to "understand, remember and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work such as make simple work related decisions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting." (*Id.*). In other words, Dr. Anwar's assessment was "some corroboration" of Lillquist's testimony. The ALJ could have resolved doubts by ordering further examination by an expert, but did not. The ALJ's failure to inquire more deeply to resolve doubts "leaves her determination that [Lillquist] is not disabled without a foundation in substantial evidence." *Hall*, 2015 WL 727962 at *2. The Court therefore remands the case to the ALJ to explain more fully why Dr. Anwar's opinion was not entitled to controlling weight.

## CONCLUSION

Lillquist's remaining arguments need not be addressed. For the reasons stated herein, the judgment of the ALJ is vacated and the case is remanded to the Commissioner for further proceedings not inconsistent with this opinion.

_____
Vi
United States District Court Judge
Northern District of Illinois

Date:  3/25/2015